IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


DAVID W. TRAMMELL,

      Petitioner,

v.                                        Case No. 5:14-CV-3232-JTM

SAM CLINE, ET AL.,

      Respondents.


## MEMORANDUM AND ORDER

Petitioner David W. Trammell brings this application for Writ of Habeas Corpus by a person in state custody pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, the application is denied.

## I.      Factual and Procedural Background

The following is an account of the facts of this case as determined by the Kansas Court of Appeals.[1]

> In February 2009, police officers in the Kansas City metro area were aware of several recent burglaries. One occurred at Nerds to Go in Overland Park, and the other at Aaron Rents in Shawnee. Electronic equipment was stolen from both businesses, and security cameras captured evidence of the burglaries. At the beginning of their night shift on February 24, 2009, Officers Curtis Rice and John Freeman of the Leawood Police Department also received a briefing and surveillance pictures concerning another burglary, this one at Reno Yamaha in Kansas City, Missouri.

> While on patrol that night, Officers Rice and Freeman came upon a white Chrysler van that matched the description of the vehicle in the briefing—a white

---

[1] State court factual findings are presumptively correct and may be rebutted only by "clear and convincing evidence." *Saiz v. Ortiz*, 392 F.3d 1166, 1175 (10th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)).

minivan with two windows on the passenger side, only one window on the driver's side, and a missing hubcap. They stopped the minivan at approximately 2:40 a.m because its license plate was obstructed and a taillight malfunctioned. The minivan stopped on a bridge.

Officer Rice approached the driver and asked for identification. Officer Freeman approached on the passenger side. Both officers testified the driver looked like the man from the Reno Yamaha burglary surveillance pictures. Trammell's license and insurance were in order. However, dispatch informed the officers that Trammell was on probation and had a criminal history that included convictions for homicide, burglary, weapons violations, and illegal drugs. Officer Rice testified he was aware the tag number of the minivan and the name Robert Simms from the crime bulletin did not match the vehicle or person they had stopped.

The officers were concerned for their safety. Officer Freeman had Trammell get out of the van. He performed a patdown search, and Officer Rice conducted a field interview contact due to Trammell's probation status. Other police officers responded to the scene and looked over the van as Officer Rice obtained additional contact information from Trammell. The other officers took pictures of the minivan and Trammell. Officer Rice asked Trammell if he was the owner and driver of the minivan and if other people drove it. Trammell responded he was the owner and only driver of the minivan.

Officer Freeman testified there were footprints on the roof of the van that appeared to match the footprints he had seen on the minivan in the criminal bulletin. Officer Freeman saw brown jersey gloves and a black stocking hat on the passenger side. Officers also saw a cuticle pusher—which can be used as a cocaine spoon for drugs—sitting on the passenger seat.

Officer James Herman testified that his drug dog "Duke" alerted to an illegal drug odor on the driver's door handle. The drug dog sniff of the vehicle occurred sometime before 3:30 a.m. Based on the cuticle pusher and the drug dog alert, the officers searched the vehicle and located the cuticle pusher, a copper Chore Boy pad cut into pieces, and copper mesh. Officers testified that all of these materials are common with crack or methamphetamine use. Officer Herman testified they did not find any drugs in the minivan. Officer Herman also testified that Duke sniffed the interior of the minivan at approximately 3:27 a.m., but he did not alert to anything inside the car.

Trammell was given another patdown search and handcuffed at 3:30 a.m. because he began to look like a flight risk. Officer Rice put Trammell in the back of his patrol car. The officers inventoried everything in the minivan at the scene. The only evidence they took into possession was that related to the possible drug charges. They did not take any of the tools that were in the minivan into evidence. The minivan was towed to a storage lot.

Officer Rob Laubenstein of the Leawood Police Department testified he quickly arrived at the scene. Officer Laubenstein observed through the minivan windows and saw several tools, pry bars, sledge hammers, and blankets in the back of the minivan. He also observed mail on the dash board. He ran the name and address on the mail through the computer because the name on the mail did not match Trammell's.

Detective Joe Langer of the Leawood Police Department heard the call over dispatch about Trammell's vehicle and immediately contacted Sergeant John Cesipro from Kansas City, Missouri Police Department (KCMOPD), and the two met at the scene. Detective Langer testified that when he saw Trammell at the scene Trammell was a match to the man in the Reno Yamaha video. Detective Langer later met with Trammell at the police department. He stated that detectives from the Shawnee, Kansas, Police Department and the Kansas City, Missouri, Police Department, spoke with Trammell at the station.

Sgt. Cesipro arrived on the scene at 3:10 a.m. He testified that from all the information and video he had from the Reno Yamaha burglary, Trammell appeared to be the perpetrator. However, Sgt. Cesipro stated that since they were in Kansas, the Leawood authorities would have to hold Trammell until the KCMOPD could get a warrant. Later that morning, Sgt. Cesipro ruled out Simms as the perpetrator of the burglaries. He followed up on the address on the mail found in Trammell's minivan. At that address, Sgt. Cesipro discovered a van with a ladder rack and wheel and a pinkish stripe down the side. These were the characteristics of the van that had been used in the Aaron Rents and Nerds To Go burglaries. The van was registered to Trammell. Sgt. Cesipro contacted the Leawood Police Department.

Trammell was transported to the Leawood Police Station at 4:42 a.m. and was put in a holding cell. Detective Steve Morgan from the KCMOPD spoke with Trammell at the police station around 6 a.m. Det. Morgan testified he gave Trammell a *Miranda* warning, and Trammell agreed to talk with him and another detective. Trammell told Det. Morgan that he owned the white minivan that he was stopped in that morning and he also owned a 1992 Chevy conversion van with faded brown stripes, a ladder, and a spare tire on the back. The conversion van was located in Kansas City, Kansas. When Det. Morgan showed Trammell the video surveillance pictures, Trammell said, "I think I need an attorney." No additional questions were asked of Trammell. Trammell's parole officer, Joe Perry, was contacted and at approximately 9 a.m., Perry issued an arrest and detain order on the violation that Trammell had been arrested for possible burglary. Det. Morgan testified the KCMOPD did not get a warrant for Trammell until sometime later in March.

Det. Morgan testified that after the interview with Trammell ended, he received a call from Sgt. Cesipro to come to the address on the mail discovered in Trammell's van for possible evidence of the other burglaries. The officers

searched the van located at the residence and the inside the residence. They discovered property that was verified as stolen from multiple burglaries in Kansas City, Missouri; Gladstone, Missouri; Blue Springs, Missouri; and Shawnee, Kansas.

Officer Rice never issued any traffic citations to Trammell. However, the State later charged Trammell with separate counts of burglary and felony theft for the burglaries at Aaron Rents and Nerds to Go based on evidence discovered at the address discovered on the mail in Trammell's minivan. Trammell sought to suppress all the evidence seized by officers based on his constitutional rights to be free from unreasonable searches and seizures. After a lengthy hearing on the motion to suppress, the trial court entered a thorough memorandum decision denying the motion, except for the evidence obtained from Trammell's cell phone without a warrant.

*State v. Trammell*, 2013 Kan. App. Unpub. LEXIS 579, at *1-7 (Kan. Ct. App. 2013). Petitioner was convicted by a jury on all counts and was sentenced to consecutive terms of 34 months incarceration on the primary burglary conviction, 13 months incarceration on the second burglary conviction, and 7 months incarceration on each of the theft convictions. *Id.* at *8. Petitioner appealed, raising the following claims that are now subject to his current habeas petition:

1.      The trial court erred in denying his motion to suppress

2.      The trial court erred in ruling on the issue of *Miranda* concerning his interrogation

3.      His van was unlawfully released after impoundment

4.      The State committed prosecutorial misconduct in its closing argument

*Id.* at *8-34. The Kansas Court of Appeals affirmed his convictions. *Id.* at *34. On December 27, 2013, the Kansas Supreme Court denied review. *State v. Trammell*, 2013 Kan. LEXIS 1319 (Kan. 2013).

On December 21, 2014, petitioner filed an application for federal habeas relief pursuant to U.S.C. § 2254 in the United States District Court for the District of Kansas. In his petition,

petitioner alleges four assignments of error: (1) the trial court erred in not suppressing evidence obtained in exploitation of his unlawful detention; (2) he was subject to interrogation in violation of *Miranda v. Arizona*; (3) his rights to due process and to present a defense were denied when his van was released without authorization, depriving him of his right to present exculpatory evidence; and (4) prosecutorial misconduct.  Dkt. 1.

## II.    Legal Standard

The court's review of petitioner's habeas motion is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  AEDPA imposes a "highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation and internal quotation marks omitted).  Accordingly, the court may not grant relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented at trial."  28 U.S.C. § 2254(d).

A state court decision is "contrary to clearly established Federal law" when: (a) the state court "'applies a rule that contradicts the governing law set forth in [Supreme Court] cases;'" or (b) "'the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

"In reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does not sit as a super-state appellate court."  *Evans v. Kan.*, 2014 U.S. Dist. LEXIS 27062,

at *3 (D. Kan. Feb. 4, 2014) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id*. at *3-4 (quoting *Schriro v. Landrigan*, 500 U.S. 465, 473 (2007)). "In order to obtain relief, a petitioner must show that the state court decision is 'objectively unreasonable.'" *Id*. at *4 (quoting *Williams*, 529 U.S. at 409) (O'Connor, J., concurring). "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Id*. (quoting *Maynard*, 468 F.3d at 671).

## III.    Analysis

### A.    Suppression of Evidence

Petitioner first argues that the trial court erred in not suppressing the evidence obtained in exploitation of his allegedly unlawful detention. More specifically, petitioner argues that officers did not have reasonable suspicion to stop him and that, after stopping him, the officers exceeded the scope of the traffic stop. In further arguments, petitioner alleges additional violations, including that his arrest for a parole violation was an illegal seizure and that his clothing must be suppressed.

Generally, Fourth Amendment claims may not be raised in a habeas corpus petition. In *Stone v. Powell*, 428 U.S. 465 (1976), the United States Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 494. "The Tenth Circuit has interpreted the 'opportunity for full and fair consideration' to include the

procedural opportunity to raise a Fourth Amendment claim, the full and fair evidentiary hearing contemplated by *Townsend v. Sain*, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963), and the state court's application of the correct and controlling constitutional standards."   *Glynn v. Heimgartner*, 2013 U.S. Dist. LEXIS 78881, at *5 (D. Kan. June 5, 2013) (citing *Gamble v. State of Okla.*, 583 F.2d 1161, 1164-65 (10th Cir. 1978)); *see also Sanders v. Oliver*, 611 F.2d 804, 808 (10th Cir. 1979), *cert. denied*. 449 U.S. 827 (1980) ("'opportunity' includes procedural opportunity to raise a claim.").

Petitioner does not allege that he lacked an opportunity for a full and fair hearing on this issue before the state trial court, and the record shows that he in fact had multiple opportunities to do so.  In August 2009, petitioner filed a 17-page pro se motion to suppress, alleging Fourth Amendment violations.  The motion alleged that: (1) the stop, detention, and search was illegal; (2) the search of the vehicle was illegal; (3) the cell phone search was illegal; (4) the arrest for a parole violation was illegal because the "Order to Arrest and Detain" was inaccurate; and (5) the seizure of his clothing was illegal.

On November 3, 2009, petitioner's attorney filed a 16-page supplemental brief in support of the motion to suppress, alleging that petitioner was stopped and seized without reasonable suspicion, that the officers exceeded the scope of the stop illegally, officers illegally searched his car and seized items, and the officers failed to read petitioner his *Miranda* warnings.   Three days later, on November 6, 2009, petitioner's attorney filed a 15-page "Motion to Suppress Illegally Seized Evidence Based on Unlawful Search Warrant Affidavit and Memorandum in Support Thereof."   In December 2009, counsel filed an "Outline and Arguments for Suppression."

On January 13, 2010, the district court filed a Memorandum Decision on the motions to suppress, denying them in their entirety with the exception of the information obtained from petitioner's cell phone without a warrant.  In March 2010, petitioner's attorney filed another motion to suppress regarding the search of the Kansas City, Missouri residence.

It is clear from the procedural history, and from the January 2010 decision of the state district court, that petitioner had an opportunity for a full and fair hearing on this issue.  Thus, petitioner cannot be granted federal habeas relief for any Fourth Amendment violation regarding suppression issues.  His first assignment of error is therefore denied.

**B.     Petitioner's statements**

Petitioner next argues multiple issues concerning his statements to police.  First, he alleges that there was no statutory authority for the officers to order his participation in the field interview contact ("FIC") because the officers had not previously spoken to or obtained authority from petitioner's probation or parole officers to conduct such an interview.  Nor had they viewed a probation or parole warrant for petitioner.  Dkt. 1, at 35.  Petitioner argues that the officers did not provide him with a *Miranda* warning during the FIC and that the FIC was just a "ruse[] used to force [him] into participating in the interrogation and to extend the duration of the stop, so officers could conduct the KOMO Reno Yamaha burglary investigation."  Dkt. 1, at 35.

There is no evidence that petitioner presented this argument to the state court on direct appeal.  Rather, petitioner previously challenged the questioning during the traffic stop that concerned whether petitioner "was the sole owner of the van and whether anyone else drove it." *Trammel*, 2013 Kan. App. Unpub. LEXIS 579, at *21.  He made no mention of his lack of *Miranda* during the portion of the stop that was categorized as the FIC, *i.e.*, the portion of the stop that discussed issues related to petitioner's probation or parole.

8

"It is well-settled that a state prisoner must satisfy the exhaustion prerequisite in 28 U.S.C. § 2254(b)(1) before filing a federal habeas corpus application, which means that each of his federal claims must have been presented to the highest court by way of either direct appeal or state post-conviction proceedings." *Kleiner v. Kan.*, 2014 U.S. Dist. LEXIS 92257, at *6 (D. Kan. July 8, 2014). "When a habeas applicant fail[s] to properly exhaust a claim in state court and those remedies are no longer available at the time the federal habeas application is filed, the applicant meets the technical requirements for exhaustion." *Id*. at *6-7 (citing *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991)); *accord Anderson v. Sirmons*, 476 F.3d 1131, 1139-40 n.7 (10th Cir. 2007). However, that federal habeas claim is then subject to dismissal under the doctrine of procedural default. "Under this doctrine, review by a federal habeas court of claims that were procedurally defaulted in state court is barred, unless the applicant can demonstrate either cause and prejudice for the default or that a fundamental miscarriage of justice would result if his claim is not considered." *Kleiner*, 2014 U.S. Dist. LEXIS 92257, at *7 (citing *Coleman*, 501 U.S. at 724); *accord Fairchild v. Workman*, 579 F.3d 1134, 1141 (10th Cir. 2009). *See also Thacker v. Workman*, 678 F.3d 820, 835 (10th Cir. 2012), *cert. denied*, 133 S. Ct. 878 (2013) (when "a particular claim [is] defaulted in state court," federal courts "recognize the state courts' procedural bar ruling and do not address the claim on the merits unless cause and prejudice or a fundamental miscarriage of justice is shown.").

The cause standard requires a petitioner to "show that some objective factor external to the defense impeded . . . efforts to comply with the State's procedural rule." *Kleiner*, 2014 U.S. Dist. LEXIS 92257, at *8 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). External factors may include such things as the discovery of new evidence, a change in the law, or interference by state officials. *Murray*, 477 U.S. at 488. As for prejudice, a petitioner must

show "'actual prejudice' resulting from the errors of which he complains." *Kleiner*, 2014 U.S. Dist. LEXIS 92257, at *8 (quoting *United States v. Frady*, 456 U.S. 152, 168 (1982)). A "fundamental miscarriage of justice" requires a petitioner to demonstrate that he is "actually innocent" of the crime of which he was convicted. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991).

Here, petitioner offers no grounds to show cause and prejudice. In fact, his Traverse (Dkt. 23) is largely a cut-and-paste copy of his original petition. He offers no new information that would suggest either cause or prejudice. Nor can petitioner establish actual innocence. To establish actual innocence, a petitioner must demonstrate that, "but for a constitutional error, no reasonable juror would have found [him] guilty." *Bell v. Heimgartner*, 2014 U.S. Dist. LEXIS 59120, at *9 (D. Kan. Apr. 29, 2014) (quoting *Dretke v. Haley*, 541 U.S. 386, 393 (2004)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 624 (1998)); *accord Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000). "To be credible, a claim of actual innocence requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Bell*, 2014 U.S. Dist. LEXIS 59120, at *10 (quoting *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995)). Petitioner has made no such showing. Therefore, he is procedurally barred from alleging claims dealing with alleged *Miranda* violations during the FIC.

With regard to those *Miranda* issues that petitioner *did* raise on direct appeal, the Kansas Court of Appeals addressed at least some portion of the field stop, as noted above, as well as petitioner's interview at the police station. Petitioner first argues that he was questioned about "who else drove the van he was stopped in . . . [and] whether he owned another fullsized[sic] van

and where it was located at" *before* he signed a *Miranda* waiver but after he was effectively being detained.

As noted above, the Kansas Court of Appeals addressed the officers' questioning of petitioner about the ownership and other possible drivers of the van. *Trammell*, 2013 Kan. App. Unpub. LEXIS 579, at *21. In response to this allegation, the Court determined as follows:

> Law enforcement officers are required to read the *Miranda* warnings to persons subject to custodial interrogations. But the courts have consistently held that routine traffic stops do not amount to custodial interrogations, given their brief duration on public streets-a marked contrast to police questioning of a suspect who has been arrested and placed behind the closed doors of a stationhouse interrogation room. This court recently acknowledged the general rule that "traffic stops are generally exempt from the typical *Miranda* rules, and police are allowed to ask a moderate number of questions to confirm identities and to confirm or dispel suspicions related to the scope of the stop."
>
> At the suppression hearing, Officer Rice testified that shortly after they stopped Trammell's van, he asked Trammell if he was the owner of the van and also if other people had driven it. Trammell responded that he was the only owner and driver of the van. Later at trial, Det. Morgan testified he gave Trammell a *Miranda* warning during the interview at the station and Trammell again confirmed that he was the registered owner of the van and that no one else drove the van. We find that the statements given to both Officer Rice and Det. Morgan were admissible.

*Id*. at *22-23 (internal citations omitted).

As a general rule, as it relates to *Miranda*, "[a] traffic stop is analogous to an investigative detention." *United States v. Fields*, 2001 U.S. Dist. LEXIS 13718, at *7 (D. Kan. July 31, 2001) (citing *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996)). "Two requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *Id*. at *8 (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)). An individual is "in custody" when "he has been arrested or his freedom is curtailed to a degree associated with a formal arrest." *Id*. (citing *Stansbury v. Cal.*, 511 U.S. 318, 322 (1994) (per curiam)). "The relevant inquiry for determining

whether an individual is 'in custody' is whether a reasonable person in that position would 'believe [his] freedom of action had been curtailed to a degree associated with formal arrest.'" *Id*. (quoting *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)).

The type of questioning that usually occurs during a traffic stop does not require *Miranda* warnings "because such police-citizen encounters are brief, non-threatening, and conducted in the presence of others."  *Fields*, 2001 U.S. Dist. LEXIS 13718, at *8-9 (citing *Berkemer v. McCarty*, 468 U.S. 420, 438-39 (1984)).  "During a traffic stop, however, law enforcement may create the custodial interrogation that *Miranda* contemplates 'by employing an amount of force that reaches the boundary line between a permissible Terry stop and an unconstitutional arrest.'" *Id*. at *9 (quoting *Perdue*, 8 F.3d at 1464) (internal brackets omitted).  To determine whether a "custody" situation arose, the court must consider the totality of the circumstances during the traffic stop, including "the circumstances relating to the questioning process, such as whether a suspect is informed that he or she may refuse to answer questions or terminate the encounter, the tone and manner of the questioning, and the separation of an individual from sources of moral support during questioning."  *Id*. (citing *Griffin*, 7 F.3d at 1518-19).

> The court must also consider the degree of restraint placed upon the suspect being questioned, including whether the suspect is physically restrained or coerced, whether the suspect's driver's license or automobile registration is retained, and whether there is a threat of physical restraint created by an officer's display of a weapon.

*Id*. at *9-10 (internal citations omitted).

Here, petitioner seems particularly concerned with his statement to Officer Rice that petitioner was the sole owner of the van and no one else drove it.  As the Kansas Court of Appeals found, however, at the time Officer Rice asked petitioner this question, he was not subject to a custodial interrogation.  At this point, law enforcement had simply stopped the van

on the basis of a traffic violation, asked the driver for identification, and determined that petitioner was on probation with a criminal history that included convictions for homicide, burglary, weapons violations, and illegal drugs. *Trammell*, 2013 Kan. App. Unpub. LEXIS 579, at *2-3. Police had petitioner get out of the van and while one officer performed a patdown search, the other conducted an FIC. It was at that point that Officer Rice asked petitioner if he was the owner and sole driver of the car, to which petitioner responded in the affirmative. *Id*. at *3.

The court therefore finds that the Kansas Court of Appeals properly concluded that petitioner was not subject to custodial interrogation at the time he made the incriminating statement and, as such, *Miranda* was not required. The statements were properly admitted. This court cannot now say that the appellate court's decision was an unreasonable application of clearly established federal law or an unreasonable determination of the facts. Accordingly, petitioner's second assignment of error is denied.

**C.      Due process violation**

Petitioner next argues that he was denied his right to present a defense when the van was released without authorization. Without the van, petitioner contends, he was deprived of the right to present exculpatory evidence.

As noted above, prior to trial, petitioner's attorney filed a motion to exclude evidence from the van because the van was released without legal authority. Counsel also filed supplemental briefing on this issue. Dkt. 19, at 19. The trial court denied these motions. On appeal, the Kansas Court of Appeals concluded that "the trial court did not err in denying [petitioner's] motion to exclude evidence of the minivan based upon release of the minivan from the tow lot." *Trammell*, 2013 Kan. App. Unpub. LEXIS 579, at *29. In so ruling, the appellate

13

court specifically noted that: (1) petitioner had access to the vehicle through a power of attorney given to someone to act on his behalf, (2) the person holding the power of attorney could have taken the minivan out from storage if he or she had paid the storage fee, (3) petitioner knew where the van was being stored, and (4) the tow company gave petitioner written notice, at an address provided by the Department of Revenue, that the van was going to be released.  *Id*. at *25-27.

"[A] defendant can establish a due process violation if he can show that: (1) the government failed to preserve evidence that was 'potentially useful' to the defense; and (2) the government acted in bad faith in failing to preserve the evidence."  *Riggs v. Williams*, 87 Fed. Appx. 103, 106 (10th Cir. 2004) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).  The inquiry into bad faith "must necessarily turn on the police's knowledge of the exculpatory value of the evidence."  *Id.* (quoting *Youngblood*, 488 U.S. at 57).  The Tenth Circuit has noted that the "mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith.  This is true even if the government acted negligently, or even intentionally, so long as it did not act in bad faith."  *Id.* (internal citations omitted).  The bad faith requirement "limits the extent of the police's obligation to preserve evidence to . . . that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."  *Id.* at *n.2.

Here, the Kansas Court of Appeals reasoned as follows:

As Trammell notes, K.S.A. 2012 Supp. 22-2512(1) prescribes the proper method of retaining and disposing of property seized. Specifically, property seized "shall be safely kept by the officer seizing the same unless otherwise directed by the magistrate, and shall be kept so long as long as necessary for the purpose of being produced as evidence on any trial." The proper disposition of the property, when it is no longer required as evidence, depends upon the nature of the property. For

instance, property that was obtained unlawfully from the owner thereof must be restored to the owner. K.S.A. 2012 Supp. 22-2512(3)(a). The statute contains a catch-all provision that directs property to "be disposed of in such manner as the court in its sound discretion shall direct." K.S.A. 2012 Supp. 22-2512(3)(g).

The record reveals the officers processed the minivan by taking photographs and collecting evidence after the minivan was towed to Dale's Tow Service on February 25, 2009. The record also reveals that Trammell knew where the vehicle was being stored and it could have been released to him through the power of attorney if he would have paid the storage fee to the tow lot. There is no evidence that Trammell was ever denied access to the vehicle.

***

Here, substantial competent evidence exists to support the trial court's finding that the officers' release of the minivan was not done in bad faith. To this end, and contrary to Trammell's assertion, there is simply nothing in the record to indicate the officers attempted to destroy or prevent Trammell from collecting evidence from the minivan or that their actions substantially prejudiced his defense.

*Trammell*, 2013 Kan. App. Unpub. LEXIS 579, at *26-29.   Again, this decision was not an unreasonable application of clearly established federal law.   Nor was it an unreasonable determination of the facts.   Accordingly, the court determines that petitioner was not denied Due Process and is therefore not entitled to relief on this claim.

**D.     Prosecutorial misconduct**

Finally, petitioner alleges that prosecutorial misconduct denied him a fair trial.   More specifically, petitioner argues that the State twice argued that aspects of the case at hand bore signature aspects of petitioner's previous crimes.   Dkt. 1, at 37.   Petitioner further argues that the two burglary cases should have been severed prior to trial.   Dkt. 1, at 38.   He did not argue this latter issue in any form on appeal.   As noted above, a failure to exhaust a claim in state court subjects that claim to procedural default upon federal habeas review.   *Kleiner*, 2014 U.S. Dist. LEXIS 92257, at *6-7.   Petitioner then bears the burden of demonstrating either cause and prejudice or that a fundamental miscarriage of justice would result.   *Id*. at *7.

Here, petitioner offers no grounds to show cause and prejudice.  Again, as was the case in his first assignment of error, petitioner's Traverse is largely a cut-and-paste copy of his original petition.  He offers no new information that would suggest either cause or prejudice or establish actual innocence.  As such, petitioner's claim that the burglary cases should have been severed is denied as procedurally defaulted.

The Kansas Court of Appeals did discuss the signature argument on direct appeal, both the mere mention of a signature and the fact that it allegedly conflicted with a jury instruction.  After analyzing the statements and jury instruction in question, the appellate court did not find that the prosecutor's comments constituted misconduct.  Rather, "the prosecutor was describing the similarities of the two burglary crimes charged against [petitioner].  The jury still had the duty to decide whether it was [petitioner] in one, both, or none of the burglaries." *Trammell*, 2013 Kan. App. Unpub. LEXIS 579, at *34.

Habeas relief is proper when a prosecutor's comment has "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Washington v. Roberts*, 2015 U.S. Dist. LEXIS 39844, at *27 (D. Kan. Mar. 30, 2015) (quoting *Darden v. Wainwright*, 477 U.S. 168, 180 (1986)).  "A petitioner seeking relief for alleged prosecutorial misconduct must show that the error is 'of sufficient significance to result in the denial of the petitioner's right to a fair trial.'"  *Id*. at *27-28 (quoting *Greer v. Miller*, 483 U.S. 756, 765 (1987) (internal brackets omitted)).  "In this analysis, the prosecutor's statement or act is viewed not in isolation, but in light of the entire trial."  *Id*. at *28.  In reviewing the record, the court considers "the strength of the evidence against the petitioner and any cautionary steps – such as instruction to the jury – offered by the court to counteract improper remarks."  *Id*. (internal citation and brackets omitted).

The statements in question are as follows:

"MS. DIEHL [PROSECUTOR]: Thank you. The biggest issue here is, obviously, the State doesn't have a confession. Told you that at the beginning. But what the State does have, the State would submit is tantamount to an admission. It's a signature. We have—

"MS. KECK [DEFENSE COUNSEL]: I'm going to object to any—trying to use one crime against the other when the instruction has been given she can't do that.

"THE COURT: Talk about the evidence of each crime.

"MS. DIEHL: [Prosecutor talked about the similarities of Trammell's van to the van in the surveillance videos] . . . .

***

"Very important piece here. You have the same jacket. You have—I would submit to you that the yellow in his waist band is actually these tools. We have the same photo of Mr. Trammell at the car stop. He's got growth, some growth. His hair is not exceedingly long, but does stick out beneath the cap. And if you look at the video carefully, you will see the hair is actually blond. You have the flaps over as well as the dark collar. That's his signature. This is Trammell. State's evidence shows beyond a reasonable doubt that that is the man."

*Trammell*, 2013 Kan. App. Unpub. LEXIS 579, at *31-32.   The trial court further provided the following instruction:

"Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

*Id*. at *31.

The Kansas Court of Appeals found that all the prosecutor was doing in her closing statement was describing the similarities of the multiple burglary charges filed against petitioner. *Id*. at *33.  Even if this was somehow improper, the Court noted, that was the entire purpose of the multicount jury instruction – "to prevent the jury from being misled into believing that a

finding of guilty on one count mandates a finding of guilty on the others." *Id*. at *33-34. This was a reasonable finding. The court is therefore confident that the prosecutor's statements would not cause a jury to unfairly evaluate the evidence. Accordingly, petitioner's claim of prosecutorial misconduct is denied.

## IV.   Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing." A petitioner can satisfy the standard by demonstrating that "the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings." *Kelley v. Pryor*, 2014 U.S. Dist. LEXIS 168229, at *16 (D. Kan. Dec. 3, 2014) (citing *Slack v. McDaniel*, 529 U.S. 473 (2000)).

The court concludes that a certificate of appealability should not issue in this case. Nothing suggests that the court's ruling in the denial of petitioner's claims is debatable or incorrect.

**IT IS THEREFORE ORDERED**, this 15th day of September, 2015, that petitioner's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254 (Dkt. 1) is hereby denied and that a certificate of appealability is denied.

**IT IS FURTHER ORDERED** that petitioner's Motion for Extension of Time to File Traverse (Dkt. 21) is denied as moot.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE